IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEVIN BROWN,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CITY OF EVANSTON, ILLINOIS,<br><br>　　　　Defendant. | Case No. 22 C 4937<br><br>Hon. LaShonda A. Hunt |

### MEMORANDUM OPINION AND ORDER

Plaintiff Kevin Brown filed this lawsuit against his former employer, Defendant City of Evanston, Illinois, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act. Defendant moves for summary judgment on all of Plaintiff's claims. (Dkt. 39). For the reasons discussed below, Defendant's motion is granted.

### BACKGROUND[1]

#### I. Plaintiff's Employment with Defendant

Plaintiff (African American) was hired by Defendant in 2012 as a Youth and Young Adult Program Manager for its Parks, Recreation, and Community Services Department (hereinafter "PRCSD"). (Dkt. 40-1 at ¶ 1). In this role, Plaintiff coordinated programs for at-risk youth in Evanston with a focus on young adults between 14 and 26 years old. (*Id.* at ¶ 2). In addition to other responsibilities, Plaintiff managed Defendant's summer youth employment program, including youth and young adult outreach workers and staff, and developed workforce training

---

[1] The relevant facts are taken from the parties' respective Local Rule 56.1 statements and are undisputed unless otherwise noted. For brevity, the Court refers to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts as "Dkt. 40-1" and Defendant's Response to Plaintiff's Statement of Additional Facts as "Dkt. 43."

1

and education initiatives. (*Id.*). Plaintiff was promoted to Community Services Manager in 2016, where his responsibilities included increasing workforce training opportunities and education, supervising youth development programs and agencies, and managing additional youth and young adult outreach workers and staff. (*Id.* at ¶ 3). The PRCSD's youth and young adult division grew and experienced success under Plaintiff's leadership. (Dkt. 43 at ¶ 4). Namely, from 2012 to 2017, the division expanded from one outreach worker to eight and received numerous accolades and awards for its positive impact in reducing violence in Evanston. (*Id.*). Those served by the youth and young adult division were predominantly people of color, as were the staff working in the division. (*Id.* at ¶ 5).

### A. PRCSD Reporting Structure and Management

During Plaintiff's employment, he reported to Karen Hawk (white), the Assistant Director of PRCSD. (Dkt. 40-1 at ¶ 4). Hawk reported to Lawrence Hemingway (African American), the Director of PRCSD. (*Id.* at ¶ 5). Hemingway reported to the city manager, who in turn reported to the mayor and the city council. (*Id.* at ¶ 6). Outside of this direct line of reporting was Jennifer Lin (Asian American), who served as Defendant's Human Resources manager from January 2015 to September 2021. (*Id.* at ¶ 7). Lin reported to Erika Storlie (white) when Storlie was Director of Administrative Services, but that changed when Storlie became interim city manager in September 2019. (*Id.* at ¶ 9).

### B. Defendant's Policies

When Plaintiff was hired in 2012, he was made aware of and received Defendant's rules, regulations, and policies. (*Id.* at ¶ 10). Specifically, Plaintiff was aware of Defendant's Standard of Conduct, which states in pertinent part: "no employee shall use, permit or request the unauthorized use of City-owned vehicles, equipment, materials or property for personal

2

convenience or profit, or for the personal convenience of others." (*Id.* at ¶ 13). Additionally, Plaintiff was aware of Defendant's Vehicle Use Policy, which stated in part that "tickets received for parking, toll, and/or moving violations shall be the responsibility of the employee." (*Id.* at ¶ 14). The parties dispute whether the Vehicle Use Policy, as written, was actually the policy in practice. (*Id.* at ¶ 14).

Plaintiff also acknowledged receipt and understanding of Defendant's BMO Harris Bank Purchasing Card Policy when he received a procurement card (hereinafter "city credit card") in February 2018. (*Id.* at ¶¶ 15, 26). In acknowledging this policy, Plaintiff agreed that the city credit card was only to be used for city-approved/business purchases, rather than for personal purchases, and improper use could result in disciplinary action up to and including termination of employment. (*Id.* at ¶¶ 16-17; 27). Plaintiff contends that although the policy instructs that the city credit card is to be used to purchase "supplies and materials," staff routinely used it for purposes beyond that, including payment of parking tickets, tolls, and towing expenses. (*Id.* at ¶ 26).

In terms of personnel policies, although denied by Defendant, the record supports that it was Defendant's policy and practice to evaluate employees annually. (Dkt. 43 at ¶ 12). Finally, Defendant's Healthy Work Environment Policy required all employees to agree to maintain a positive, professional communication, support a healthy work environment for all employees, and treat fellow employees with respect and fairness. (Dkt. 40-1 at ¶ 22).

### C. Prior Disciplinary Actions Against Plaintiff

Prior to his employment ending in November 2019, Plaintiff had been disciplined three times during his tenure with Defendant. First, he was issued a one-day suspension in June 2012, for threatening the then-Director of PRCSD. (Dkt. 40-1 at ¶ 18; Dkt. 43 at ¶ 3). At that time, Plaintiff was still a probationary employee. (*Id.*). Second, in November 2018, Plaintiff received a

verbal warning for using unprofessional communications and being insubordinate to Hemingway in front of then-city manager Wally Bobkiewicz. (Dkt. 40-1 at ¶¶ 6, 19).

Finally, in May 2019, Plaintiff received a one-day suspension for violating Defendant's Healthy Work Environment Policy. (Dkt. 40-1 at ¶ 25). In March 2019, Plaintiff had attended a meeting led by Melissa Parker (white), a Project Assistant. (*Id.* at ¶ 20). Among other things, the purpose of the meeting was to discuss a new procedure for distributing pay checks to youth involved in the summer youth employment program. (*Id.*; Dkt. 43 at ¶ 19). Plaintiff felt the new procedure was discriminatory towards black and brown kids. (Dkt. 43 at ¶ 19). During the meeting, he made a comment about Parker being white. (Dkt. 40-1 at ¶ 20). Parker contends that Plaintiff increased his tone and spoke over her in an intimidating and threatening manner while Plaintiff maintains that Parker escalated the conversation. (*Id.*). Regardless, Parker filed a Healthy Work Environment complaint against Plaintiff on March 21, 2019, and Plaintiff lodged a counter-complaint against her on March 22, 2019. (*Id.* at ¶¶ 21, 23; Dkt. 43 at ¶ 20). Plaintiff claimed that Parker had acted in a discriminatory manner towards him and made racist comments, and in addition, he raised general complaints about racism and implicit bias, specifically within Defendant's Healthy Work Environment Policy itself. (Dkt. 40-1 at ¶ 23; Dkt. 43 at ¶ 20). After an investigation by an outside firm, Plaintiff was suspended based upon a finding that he had violated the Healthy Work Environment Policy for escalating the exchange with Parker by his comment that her "whiteness [was] trying to stop the conversation" and unprofessional conduct. (Dkt. 40-1 at ¶¶ 24-25). Parker received a verbal warning for the tone she used in responding to Plaintiff. (*Id.* at ¶ 25).

### D. **Plaintiff's Use of City Credit Card**

Between February 2018, when he received the card, and November 2019, when his employment ended, Plaintiff used his city credit card to pay for one towing fee and nine parking tickets issued to youth and young adult outreach staff who were driving both city and personal vehicles. (*Id.* at ¶ 39). Some of these tickets were issued for parking in the two-hour visitor parking spaces in Defendant's Civic Center parking lot. (*Id.*). Plaintiff had previously been instructed on three occasions that his staff was not allowed to park in the two-hour visitor spots, and on the last of those occasions (in July 2018), Hawk reminded Plaintiff that the parking policies would be enforced and staff would be responsible for tickets if issued. (*Id.* at ¶¶ 32-35). Nevertheless, the parties hotly contest whether Plaintiff was instructed by or received approval from his supervisors, namely Hawk and Hemingway, to pay for his staff's parking tickets using his city credit card. (*Id.* at ¶¶ 28, 39, 42, 48-51, 53-55, 57, 64).

Employees who used their city credit cards were required to reconcile any charges by completing an expense report, which involved uploading a receipt onto a website and reporting the date of the transaction, place of purchase, amount of the transaction, and an account code. (*Id.* at ¶ 29). Employees who did not have receipts could upload a "Statement in Lieu of Receipt" ("SILR"), which required the signature of the employee's supervisor. (*Id.* at ¶¶ 30, 42). The parties dispute whether a receipt was actually required in practice (given the option to use a SILR) and whether regularly using a SILR was permissible. (*Id.* at 30, 52). As Plaintiff's supervisor, Hawk was responsible for approving his city credit card charges. (*Id.* at ¶ 31).

At some point, Storlie called Hawk and questioned her about a $76.00 charge on Plaintiff's city credit card for a parking ticket. (*Id.* at ¶ 36). Storlie also called Lin and asked her to investigate this and other charges she deemed odd. (*Id.* at ¶ 37). In response to a request from Lin, Hawk

5

pulled information related to Plaintiff's card usage. (*Id.* at ¶ 38). Upon investigation, Defendant concluded that Plaintiff was attempting to conceal his use of the city credit card to pay for parking tickets by improperly describing the charges in expense reports as "outreach parking" or "parking" and checking a box that indicated that a receipt (rather than a SILR) had been uploaded. (*Id.* at ¶¶ 40, 42, 46). In fact, for the payment of parking tickets, Plaintiff had only uploaded SILRs, none of which had been signed by Hawk, even though the receipt for each parking ticket was found in Plaintiff's email inbox. (*Id.* at ¶¶ 41,46).

Plaintiff denies that he was trying to conceal the true nature of the charges from Hawk. He further points out that Hawk was aware of and approved these charges, including at least one which was described as "City of Evanston parking ticket on outreach vehicle" and others described as "ticketed outreach vehicle." (*Id.* at ¶¶ 40, 42, 46, 52). As a result of the investigation, Hawk received a one-day suspension for her negligence in (1) simply assuming without double checking staff representations that a receipt had been uploaded, (2) failing to ensure that Plaintiff had uploaded corresponding receipts for his "parking" charges, and (3) inadvertently approving such charges. (*Id.* at ¶¶ 43-44).

II. <u>**Plaintiff's Termination**</u>

On October 31, 2019, after the investigation of Plaintiff's city credit card usage, Hemingway recommended that Plaintiff be terminated. (*Id.* at ¶ 56). Defendant maintains this recommendation stemmed from Plaintiff's misuse of the city credit card and resulting violations of various city policies. (*Id.* at ¶¶ 56-57). Hemingway and Lin sent Plaintiff notice of a pre-disciplinary meeting scheduled for November 4, 2019. (*Id.* at ¶ 58). That notice included a statement of charges and an explanation of the evidence compiled against Plaintiff, and informed him that he would be provided an opportunity to discuss and rebut the charges. (*Id.*). The pre-

disciplinary meeting was held as scheduled, but the parties disagree about Plaintiff's ability to discuss the charges or his forthcoming rebuttal. (*Id.* at ¶ 59). Still, Plaintiff submitted a rebuttal two days later, on November 6, 2019; however, Hemingway and Lin determined that the charges were substantiated. (*Id.* at ¶ 60). Hemingway considered not only the results of the investigation but also Plaintiff's three prior instances of discipline in deciding that termination was appropriate. (*Id.* at ¶ 61).

Storlie disagreed with Hemingway's recommendation and instead offered Plaintiff a ten-day unpaid suspension and Last Chance Agreement in lieu of termination around November 12, 2019. (*Id.* at ¶ 62). Lin drafted the letter. (*Id.* at ¶ 63). Plaintiff admits this offer was presented to him but insists Defendant did not intend to maintain his employment. (*Id.* at ¶¶ 62, 80). Plaintiff was given until November 14, 2019 to accept these terms, and when he did not do so, Defendant terminated his employment on November 15, 2019.[2] (*Id.* at ¶¶ 65-67, 75). Although Plaintiff appealed his termination on November 22, 2019, Defendant upheld the decision and informed him of the same on December 12, 2019. (*Id.* at ¶¶ 68-70).

Plaintiff contends that Hawk and Lin pursued his termination because they are racists, even though he is not aware of either using a racial epithet or calling him out of his name. (*Id.* at ¶¶ 70, 78). According to Plaintiff, throughout the course of his employment, Hawk met with Plaintiff less frequently than other similarly situated employees to provide guidance and direction. (*Id.* at ¶¶ 76-77). Specifically, Plaintiff claimed that Hawk spent more time with Ray Doerner (white), the former Assistant Director of Community Services who reported to Hemingway, and Angela Allen

---

[2] The Court notes that according to Defendant, it terminated Plaintiff only because *he* did not accept the suspension and last chance agreement, and so, essentially, Plaintiff voluntarily ended his own employment. (Dkt. 40-1 at ¶¶ 66, 75). For simplicity, the Court refers to Plaintiff's "termination" in this opinion but notes the distinction raised by Defendant.

(white), a Program Coordinator in the arts center. (*Id.* at ¶ 77). Plaintiff also complains that he was not evaluated annually per Defendant's policy. (Dkt. 43 at ¶ 12). Finally, Plaintiff believes that Storlie and Parker were friends and his March 2019 complaint against Parker impacted Storlie's decisions about his employment. (Dkt. 40-1 at ¶ 79). Nevertheless, Plaintiff admits that during the investigation into his city credit card usage, when Hemingway recommended termination, and when Storlie offered him progressive discipline instead, his race was never discussed. (*Id.* at ¶ 74).

It is undisputed that Plaintiff spoke up about issues of racial inequity. (Dkt. 43 at ¶¶ 6, 7, 9). Plaintiff further believes that Defendant was uncomfortable with the community the youth and young adult division served. As a result, he posits, the division was treated differently than other divisions, and this animus led to an effort to remove him from his position. (*Id.* at ¶¶ 8, 10, 14). Moreover, Plaintiff believes that he was treated differently by Hawk, Lin, and Hemingway based on his race and that each was involved in his termination along with Storlie. (*Id.* at ¶¶ 11, 34).

In September 2022, Plaintiff filed a four count complaint against Defendant alleging race discrimination (counts I and II) and retaliation (counts III and IV). Defendant's fully briefed motion for summary judgment is ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to demonstrate "specific facts

showing that there is a genuine issue for trial," *id.* at 324, and support their position with "more than a scintilla of evidence." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Summary judgment is the time for a litigant to "put up or shut up" by "show[ing] what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (quotations omitted). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, all "justifiable" inferences are drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *see also Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (non-moving party receives "benefit of conflicting evidence" as well as "any favorable inferences that might be reasonably drawn from the evidence."). Additionally, a court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advocate Health & Hosps., Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted).

## DISCUSSION

### I. Race Discrimination

Plaintiff contends that Defendant discriminated against him because of his race in violation of federal and state law.[3] Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). In

---

[3] In analyzing alleged violations of the Illinois Human Rights Act, Illinois state courts apply the same framework that is applied to Title VII claims in federal court. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016). Therefore, the Court's analysis of Plaintiff's federal and state race discrimination claims is identical.

Title VII cases, "an unlawful employment practice is established when the [plaintiff] demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* at § 2000e-2(m). A plaintiff may prove race discrimination using the traditional burden-shifting test articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the more holistic approach recently set out by the Seventh Circuit in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Because the parties reference both standards, the Court analyzes Plaintiff's claims under *McDonnell Douglas* and *Ortiz*.

### A. *McDonnell Douglas* Burden-Shifting Method

The *McDonnell Douglas* test requires a plaintiff to establish a *prima facie* case of discrimination by showing that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from the employer." *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). If a plaintiff is successful in doing so, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the employer can articulate such a reason, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)).

Plaintiff's race discrimination claims fail at the outset because he cannot establish a *prima facie* case. He belongs to a protected class and was subjected to an adverse action, leaving only the second and fourth elements at issue. While the parties debate if Plaintiff's job performance was satisfactory, the Court need not resolve that issue as Plaintiff has not satisfied the similarly situated prong of the test.

As Defendant correctly points out, Plaintiff has made no attempt to identify a similarly situated employee outside of his protected class who was treated better than him. (Def.'s Reply at 4, Dkt. 42).[4] At most, Plaintiff claims that he was treated "differently" by his managers and his fellow employees "based on his race and his advocacy for racial equality." (Pl.'s Resp. at 4-5). And that white employees were treated better by managers and fellow employees. *(Id.)* But such complaints of general differential treatment fall short of satisfying the fourth *McDonnell Douglas* element. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (rejecting argument that "eight other [employees with the same job title] under [his boss's] supervision qualify as similarly situated employees" where plaintiff did "not provide any information that would allow a finder of fact to determine that these individuals [were] indeed similarly situated" as he "did not submit the employees' names, work history, performance reviews").

Plaintiff provides even less detail here than in *McDaniel*, as he seems to assert only that unnamed white employees with unknown job titles were favored. But to proceed, he must show that Defendant treated him differently than someone outside his protected class who is "directly comparable in all material respects." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). In other words, details about the proposed comparators matter. Lacking those here, Plaintiff fails to meet his *prima facie* burden. *See McDaniel*, 940 F.3d at 368 ("Since [plaintiff] did not put forth sufficient information about similarly situated employees outside of his class that were treated more favorably, his discrimination claim fails under the *McDonnell Douglas* framework.").

---

[4] Defendant specifically argues that Allen and Doerner, two white employees, are *not* similarly situated individuals (Dkt. 39-2), a contention Plaintiff did not rebut in his opposition brief. (Dkt. 40). In fact, Plaintiff does not discuss these employees at all. Thus, he has forfeited the argument.

11

B. *Ortiz* Test

As an alternative to *McDonnell Douglas*, Plaintiff relies on *Ortiz*, which instructs that "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766. Stated differently:

> Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

*Id.* at 765. In applying *Ortiz*, the standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . *caused* the discharge or other adverse action." *Id.* (emphasis added). The Seventh Circuit has identified "ambiguous or suggestive comments or conduct," "better treatment of people similarly situated but for the protected characteristic," and "dishonest employer justifications for disparate treatment" as "three broad types of circumstantial evidence that will support an inference of intentional discrimination." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). Even after drawing all reasonable inferences in Plaintiff's favor, the Court concludes that the evidence "as a whole" in this record does not come close to suggesting that Plaintiff was terminated because of race.

With no direct evidence of discrimination, Plaintiff must rely on the "broad" categories of circumstantial evidence identified by *Joll*. This record does not contain any "ambiguous or suggestive" comments which would support a finding of discriminatory animus. Neither Hawk nor Lin nor anyone else for that matter used racial or other inappropriate terms in connection with Plaintiff. Second, as already discussed *supra*, Plaintiff has not pointed to any specific evidence that Defendant treated similarly situated non-African American employees better than him. True, Plaintiff maintains that Hawk spent more time meeting with white employees and generally

12

dismissed Plaintiff's questions or points of conversation. But those facts, standing alone, are insufficient without context for the comparison, such as their job titles, disciplinary history, or record of serious policy violations.

Finally, Plaintiff challenges Defendant's justification for his termination as dishonest. The Court acknowledges the record is not entirely clear on the extent to which Plaintiff may have been permitted, or even instructed, to use his city credit card to pay for his staff's parking tickets (regardless of whether those tickets were issued for parking violations, towing violations, or something else) and whether he intentionally tried to disguise such credit card use through the reconciliation process. Even so, Plaintiff has not come forward with any evidence that the true reason for his termination (or any alleged inconsistent enforcement of the rules) was his race.

No doubt, Plaintiff was an outspoken advocate for the young adults who benefited from the transformative work of his team. Such advocacy may have resulted in tense and uncomfortable conversations about race in the workplace, which led Plaintiff to feel that his division was not being supported or receiving the recognition it deserved. Still, Plaintiff's speculation that racial animosity caused his termination, without more, cannot stave off summary judgment. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment."). *See also Dale v. Chi. Trib. Co.*, 797 F.2d 458, 465 (7th Cir. 1986) (affirming summary judgment and holding that "[plaintiff] must do more than challenge the judgment of his superiors through his own self-interested assertions.").

Plaintiff emphasizes the unfairness of firing him for such a minor infraction. But this Court is not tasked with determining if Defendant's actions were correct. The pretext inquiry is limited to assessing if Defendant was motivated by illegitimate animus. In the end, "[t]his Court does not sit as a super-personnel department that reexamines an entity's business decisions." *Dale*, 797 F.2d

13

at 464. Because the record does not reflect evidence of illegal bias underlying the termination decision, Plaintiff's discrimination claims also fail under *Ortiz*.

### C. Cat's Paw Theory of Liability

On a related note, Plaintiff advances a theory of "cat's paw" liability, "meaning that the ultimate decisionmaker issued an adverse employment action based on the discriminatory animus of another." *McDaniel*, 940 F.3d at 370. Specifically, Plaintiff contends that "the discriminatory or retaliatory acts of Hawk, Parker, Lin, and Hemingway" may be used to demonstrate that "bias was a proximate cause of the ultimate employment action" rendered by Storlie. (Dkt. 40 at 4-5). The Court disagrees.

The "cat's paw" provides that "an employer is liable if a non-decision-maker who is motivated by discriminatory bias is a proximate cause of another employee's adverse employment action." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 605 (7th Cir. 2014). To succeed on such a theory, a plaintiff must show that the non-decisionmaker actually harbored discriminatory animus against the plaintiff and was a proximate cause of the adverse employment action. *Id.* According to the Supreme Court, "[p]roximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (citations and quotations omitted). "Because the cat's paw theory requires a showing of both discriminatory animus and proximate causation, [a court] need not address both prongs if the employee makes an insufficient showing on one." *Nichols*, 755 F.3d at 574.

That theory cannot save Plaintiff's claims here. Assuming *arguendo* that Hawk, Parker, Lin, and Hemingway harbored any impermissible bias toward Plaintiff—which the Court does not find in this record—there is still no evidence that such animus *proximately caused* Plaintiff's

14

termination. Plaintiff insists that each individual influenced Storlie's decision here, but the record contains nothing to back up that assertion. Again, Plaintiff cannot establish causation through his own speculation.

Accordingly, summary judgment is granted in favor of Defendant on Plaintiff's race discrimination claims.

## II. **Retaliation**[5]

Plaintiff's claims that he was retaliated against for complaining about racial bias fare no better than his claims of racial discrimination. A plaintiff may prove retaliation under either a direct or indirect method of proof. Under the direct method, a plaintiff must present evidence of "'(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (citing *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010) (citation omitted)). Under the indirect method, "the first two elements remain the same, but instead of proving a direct causal link, the plaintiff must show that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination." *Stephens v. Erickson*, 569 F.3d 779, 786–87 (7th Cir. 2009). Similar to the *McDonnell Douglas* test, if a plaintiff can establish a prima facie case of retaliation under the indirect method, the burden shifts to the defendant to provide a nondiscriminatory justification for its action and, if the defendant meets that burden, it falls on the plaintiff to establish that the defendant's justification is pretextual. *Id.* at 787.

---

[5] As with race discrimination, federal and state law claims of retaliation are analyzed using the same framework. *Volling*, 840 F.3d at 383.

The Court can quickly dispose of Plaintiff's retaliation claims under both methods for the same reasons discussed *supra* with regard to his race discrimination claims. Plaintiff cannot prevail under the indirect method without identifying a similarly situated employee who was treated more favorably after engaging in protected activity. In fact, Plaintiff does not cite a single other employee—regardless of race—who complained to Defendant about racial bias or discrimination.

And proceeding under the direct method is a nonstarter because Plaintiff cannot establish causation between his complaint and termination. Construing the facts in his favor on summary judgment, Plaintiff engaged in protected activity in March 2019 when he raised concerns about Defendant's Healthy Work Environment Policy. Roughly eight months passed, though, before Defendant ended his employment. Courts routinely hold that such a length of time cuts against finding a causal connection between the protected activity and the adverse employment action. *See, e.g.*, *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 570 (7th Cir. 2012) (holding that no casual connection could be found when five months pass between the protected activity and the adverse employment action). Even if the timeframe was shorter, Plaintiff has no evidence of but-for causation such as admissions of retaliatory animus by the decisionmakers or sufficient circumstantial evidence to raise a triable issue of fact. Put simply, on this record, no reasonable jury could rule in Plaintiff's favor.

Accordingly, summary judgment in granted in favor of Defendant on Plaintiff's retaliation claims.

## **CONCLUSION**

For all the foregoing reasons, Defendant's motion for summary judgment is granted.

**DATED**: March 12, 2025                    **ENTERED**:

                                                                 _LaShonda A. Hunt_
                                                                 LASHONDA A. HUNT
                                                                 United States District Judge